Filed 3/27/25  P. v. Sims CA3

NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C096896 |
| Plaintiff and Respondent, | (Super. Ct. No. 93F03509) |
| v. | |
| ROBERT DANIEL SIMS, | |
| Defendant and Appellant. | |

Defendant Robert Daniel Sims appeals the trial court's denial of a motion to dismiss his case under the Sexually Violent Predator Act (Welf. & Inst. Code, § 6600 et seq.) (Act) for failing to provide a timely trial.  This is not our first time reviewing defendant's case.  (See *People v. Sims* (Feb. 24, 2021, C088029) [nonpub. opn.] (*Sims*).)  In defendant's last appeal, we conditionally reversed the judgment finding defendant a sexually violent predator and directed the trial court to hear defendant's previously

1

raised, but not addressed, *Marsden*[1] and speedy trial motions, as well as any other motion defendant's counsel raised on remand. (*Sims*, *supra*, C088029.) On remand, the trial court granted defendant's *Marsden* motion, appointed new counsel, held an evidentiary hearing on defendant's speedy trial motion, and denied the motion, thus reinstating the prior judgment finding him a sexually violent predator.

In this appeal, defendant contends his counsel on remand was prohibited from representing him due to a conflict of interest and provided ineffective assistance of counsel for a variety of reasons. Defendant further contends the trial court erred by denying his speedy trial motion. We disagree and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

We granted defendant's motion to incorporate the record of his prior appeal. As we noted in our opinion from the prior appeal, the record merely provided a procedural timeline of defendant's case and was not developed regarding the reasons for the delay between the filing of the petition to commit defendant as a sexually violent predator and the eventual trial. (*Sims*, *supra*, C088029.) That problem was rectified on remand when the trial court held an evidentiary hearing regarding defendant's motion to dismiss, at which defendant, defendant's trial counsel Robert Saria, and Saria's investigator Randall Costa testified. We will recount the procedural history of defendant's proceedings from our prior opinion and provide explanations for the various delays as taken from the evidentiary hearing.

I

*The Petition Was Filed In January 2009*

"On January 29, 2009, the Sacramento County District Attorney filed a petition to commit defendant as a sexually violent predator. . . . On February 2, 2009, . . . the trial

---

[1] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

2

court ordered defendant to be held in a secure facility until a probable cause hearing could be held.  Also, Robert Saria was appointed as defendant's attorney." (*Sims*, *supra*, C088029.)

Defendant testified at the hearing on his motion to dismiss that he did not recall what occurred in February 2009.  Saria testified defendant appeared in court on February 10, 2009, and he met with defendant on February 13, 2009.  At that time, four reports were attached to the petition to commit defendant under the Act, including one report concluding defendant did not meet the criteria of a sexually violent predator.

II

*February 2009 Through July 2009*

"Defendant's probable cause hearing was continued approximately seven times until July 20, 2009.  The continuances were predominantly requested by Saria and sometimes by others on his behalf because Saria was in trial.  It appears defendant was present for one of these hearings, at which he expressed confusion about the legal process and asserted his right to a speedy and public trial.  Defendant also wrote to the trial court before the probable cause hearing requesting a new attorney because Saria and Saria's investigator[, Costa,] failed to visit him, take his calls, and investigate his case.  The trial court indicated it planned to hear defendant's complaints during a *Marsden* hearing, however, the record does not reflect the trial court ever held such hearing.  At the July 20, 2009, probable cause hearing, defendant waived his right to a probable cause hearing entirely and stipulated to the prosecution's experts' reports.  Defendant was then transported to Coalinga State Hospital." (*Sims*, *supra*, C088029, fn. omitted.)

Saria testified at the dismissal hearing that he was present at the hearing when defendant asked for a speedy trial and, as a result, Saria arranged for his investigator, Costa, to meet with defendant.  Costa met with defendant on March 12, 2009, and e-mailed Saria his observations, which included that defendant appeared disheveled, exhibited pressured speech, presented as anxious and tense, and was hallucinating.  Costa

3

also noted defendant had been in jail for 25 days without his medication. Given these facts, Saria did not believe defendant was in an appropriate condition to be evaluated by a defense expert or assist in his defense and, consequently, Saria did not set defendant's case for trial. Saria contacted the county jail and requested it assist defendant, who Saria believed was experiencing "active symptoms of psychosis or some type of mental illness."

Saria contacted an expert and described defendant's symptoms, which the expert believed would take weeks to resolve with treatment. Because proceedings under the Act do not permit counsel to declare a doubt as to a client's competency, Saria believed it was best to hurry defendant through the probable cause hearing so he could be transported to the state hospital and "stabilized" while Saria prepared the case. Saria testified he did not receive a letter from defendant requesting a new attorney and he did not recall being informed of the *Marsden* discussion between the court and substitute counsel occurring in his absence. According to Saria, defendant never complained of his representation in his presence.

### III

### *July 2009 Through June 2013*

"Defendant's case was thereafter continued multiple times, exclusively at Saria's request, until January 2013 when the parties set a trial date for June 27, 2013. . . . [¶] During the three and one-half years of these requested continuances, defendant filed two petitions for writ of habeas corpus and sent two letters to the court. In the first petition, filed in July 2011, defendant alleged Saria failed to investigate his case and communicate with him, and also that Saria took advantage of defendant's mental illness. Defendant requested a 'marsh motion' and dismissal of his attorney. Defendant's petition was denied because he could seek the relief he requested in his sexually violent predator proceeding. A copy of the order denying defendant's petition was sent to Saria, the prosecutor, and the trial court [hearing defendant's matter under the Act].

4

"A few months after the denial of his first petition for writ of habeas corpus, defendant sent a letter voicing the same complaints found in his [prior] petition. Two weeks later, defendant sent another letter, again complaining of the issues raised in his [prior] petition. At least one of defendant's letters was construed as a motion for reconsideration and denied. The denial was again forwarded to Saria, the prosecutor, and the trial court.

"In August 2012, defendant filed [a] second petition for writ of habeas corpus. In that petition, he alleged: '[Defendant], has been here at Coalinga [S]tate Hospital a long time with<u>out</u> court. His [*sic*] asking this court and judge to give him a court [order]. To grant [defendant a] speedy trial. [H]is attorney will not do this at all for him. This person [h]as a legal right to go to court.' Defendant's petition was denied because he could . . . seek his requested relief in his sexually violent predator proceeding. A copy of the order denying defendant's petition was forwarded to the prosecutor, Saria, and the trial court." (*Sims*, *supra*, C088029, fn. omitted.)

Saria testified at the hearing on defendant's motion to dismiss that, upon arriving at Coalinga State Hospital, defendant was undergoing treatment to stabilize his mental health. Costa visited defendant soon after his arrival and learned defendant was still hearing voices. On September 1, 2009, Costa told Saria that defendant wanted to start working on a release plan and he was willing to start treatment. Later in September 2009, defendant violated parole by committing a sexual battery against an instructor at Coalinga State Hospital and was placed in prison until June 2010. During that time, Saria and Costa attempted to locate defendant, read defendant's hospital records, and continued defendant's matter until he served his term for the parole violation and was transferred back to Coalinga State Hospital.

Following defendant's return to Coalinga State Hospital, Saria continued defendant's matter for several months. In November 2010, Costa observed and reported to Saria that defendant was in a wheelchair and was wearing a helmet due to a seizure

5

condition. Saria continued to request continuances until March 2011. While Saria testified he informed defendant of the continuances, defendant testified he was never notified of the continuances and never agreed for Saria to continue his trial. In March 2011, Costa observed and informed Saria that both of defendant's legs were broken, he was wearing a helmet due to his seizure condition, and he was rocking back and forth during conversation. Defendant, however, was also engaged in sex offender treatment and defendant wanted to go to court so he could go home. Between the time defendant returned from prison until June 2011, he had been cited multiple times for being verbally and physically aggressive and masturbating in public areas of Coalinga State Hospital. For a successful outcome at trial, including entry into outpatient services, Saria recommended defendant engage in treatment so he would not present to a fact finder as unable to control his mental illness.

To give defendant more time to engage in treatment, Saria requested a continuance from May 2011 to August 2011. In July 2011, defendant told Costa and Costa reported to Saria that defendant's health was improving and he was working on a release plan as recommended by Saria. Saria acknowledged receiving an order denying defendant's July 2011 petition for writ of habeas corpus; however, defendant never addressed the issue with Saria and Saria was never served with defendant's petition requesting a new attorney to provide context to the order. Saria testified he later learned of the denial of the construed motion for reconsideration defendant filed in October 2011. Defendant called Costa in early October and never mentioned problems he had with Saria's representation. From May 2011 through October 2011, defendant was cited multiple times for committing threatening acts towards staff and other rule violations, including rubbing against a female staff member. Defendant was also receiving medication involuntarily.

Saria testified he requested additional continuances to allow defendant to engage in treatment based on his and Costa's discussions with defendant about what was needed

6

to prepare for trial and receive a successful outcome. Defendant acknowledged during his testimony that he had conversations with Saria about the best trial strategy being to engage in treatment for one to two years. In March or April 2012, Costa visited defendant and reviewed defendant's release plan. In May 2012, defendant told Costa and Costa reported to Saria that defendant was beaten by hospital staff and appeared to have a head injury. In late May 2012, defendant was put on a forced medication order. Defendant further had continued to be cited for aggressive behavior and rule violations. Saria testified he considered these circumstances setbacks to scheduling trial. Over the course of the next several months, Saria obtained and reviewed transcripts of defendant's testimony at the administrative hearing resulting in his forced medication order. Saria also reviewed defendant's case with Costa.

Saria was unaware of defendant's request for a speedy trial in a petition for writ of habeas corpus filed on August 2012, which was later denied. In October 2012, Saria requested a continuance to January 2013, during which time Saria was preparing for trial. Also in October 2012, Saria learned of an altercation defendant had while in Coalinga State Hospital and that defendant had stopped engaging in treatment. In January 2013, defendant contacted Costa and told him he was in treatment and working to get into an outpatient program. Defendant later told Saria he was ready to go to trial. Saria communicated with defendant acknowledging his desire to get into outpatient treatment and told defendant that engaging in sex offender treatment was the best way to win at trial, especially if he wanted a conditional release. Given defendant's request for trial, Saria set a trial date of June 27, 2013.

IV

*June 2013 Through January 2016*

"At the trial readiness hearing for the June 2013 trial, Saria requested the release of records obtained by the prosecution and the prosecution stipulated to their release. Saria also asked the trial court to vacate the June trial and move it to July. At the July

7

2013 hearing and thereafter, Saria requested multiple continuances, to which the prosecution agreed. Defendant was not present at these hearings. Saria indicated during several requests that he was waiting on an expert's report, during several others that he was waiting on records from the state hospital, and at another that he was having 'expert witness issues.' Saria further represented to the trial court in January 2016 that defendant was having 'significant medical issues that he[ was] dealing with, and he [did not] feel he[ was] medically stable enough in order to have the riggers [*sic*] of coming to Sacramento and doing a trial.' " (*Sims*, *supra*, C088029.)

At the hearing on defendant's motion to dismiss, Saria testified that defendant's treatment records were released at the trial readiness hearing for the June 2013 trial. The records consisted of thousands of pages, which Saria and the expert could not review before the June 2013 trial, so Saria continued the trial setting date to July 12, 2013. On June 19, 2013, Saria visited defendant and discussed trial. He then set a trial date of September 27, 2013, with the court. When the day for trial arrived, Saria was engaged in another trial, so defendant's trial was taken off calendar and Saria set a trial setting date for November 8, 2013. Saria, however, was engaged in another trial from November 6, 2013, through November 21, 2013, necessitating a continuance of defendant's trial setting date to January 9, 2014, to accommodate experts' typical schedule preferences.

In the middle of November 2013, Costa met with defendant, who told him he wanted to delay trial for a year to engage in treatment. Upon learning of this, Saria deferred to defendant's request not to go to trial and at the next hearing continued the matter to February 2014. In February 2014, Saria asked for the matter to be continued to March 2014. On March 1, 2014, defendant demanded to go to trial that summer, and Saria set the matter for a trial readiness hearing in August 2014 and trial in late October 2014 based on his experience of the time it typically took for experts to become prepared. By October 21, 2014, defendant's records had still not arrived from Coalinga State

8

Hospital, necessitating the matter to be continued to January 6, 2015. The records eventually arrived on November 20, 2014.

In January 2015, Saria was not ready to go to trial because the records were over 10,000 pages, so he continued trial to March 2015. When defendant asked whether trial would proceed, Saria responded with a status update and detailed everything that needed to occur to proceed to trial. Saria was in trial from March 4, 2015, through March 17, 2015, and continued defendant's trial to May 26, 2015. Also in April 2015, defendant told Costa he had spoken to state experts, meaning there were new records that would be delivered to Saria for review within four to six weeks. In August 2015, defendant indicated he had experienced a grand mal seizure, requiring him to use a walker. Saria then requested multiple continuances until November 17, 2015, because the defense expert was not ready.

On November 9, 2015, the defense expert told Saria he could not testify favorably for defendant because he believed defendant's mental health condition caused him to have no impulse control, which led to his many sexual indiscretions. While the expert acknowledged defendant's behavior had improved, he indicated he believed defendant's behavior was unpredictable and defendant was likely to reoffend. The expert recommended defendant engage in further treatment.

In situations like this, Saria typically asked his clients whether they would be willing to engage in treatment instead of going to trial. If the client says no to engaging in treatment, then Saria goes to trial. Given the facts of defendant's case, Saria believed it was likely defendant would be found as meeting the criteria of a sexually violent predator under the Act, so he and Costa advised defendant to reengage in treatment and demonstrate a couple of years of good behavior before going to trial. At the next court hearing, Saria told the trial court he had expert witness issues and was given a continuance to January 21, 2016, with defendant's permission.

9

## V

### *February 2016 Through July 2016*

"In March 2016, defendant filed another petition for writ of habeas corpus citing *Litmon v. Superior Court* (2004) 123 Cal.App.4th 1156, and asserting a speedy trial violation. Defendant also complained about Saria's ineffective representation. Defendant's petition was denied for the same reason his petitions were denied in 2011 and 2012. The order denying defendant's petition was sent to the prosecutor, Saria, and the trial court. While the trial court and Saria acknowledged the order, defendant's concerns were not addressed." (*Sims*, *supra*, C088029.)

Saria testified at the hearing on defendant's motion to dismiss that it was not uncommon for a defendant in a proceeding under the Act to file multiple petitions for writ of habeas corpus about matters related and unrelated to the pending petition. If defendant had raised any of the issues raised in the petition personally with Saria, Saria testified he would have communicated defendant's wishes to the court. Defendant testified that he did tell Saria multiple times throughout the pendency of his case and through various methods, including through Costa, that he did not want Saria to be his attorney and that he wanted to go to trial. After defendant filed his March 2016 petition, Saria continued the hearings in defendant's case due to defendant's medical issues and to give defendant time to heal and engage in treatment.

## VI

### *August 2016 Through September 2018*

"Starting in August 2016, Saria, and those standing in for him because he frequently was not present, represented to the trial court that defendant was 'programming' and deciding whether to go to trial, which apparently defendant decided to do in June 2017 when trial was set for the end of the year. In November 2017, Saria had surgery and required recovery time. Defendant's case was taken off track for trial. In January 2018, defendant's case was again set for trial, this time for May of that year.

10

On May 3, 2018, trial for later that month was confirmed, but when the day arrived, Saria was in trial with another client and the matter was continued to August[ 2018]. In August[ 2018], Saria was again in trial and defendant's trial was continued to September 2018. On September 6, 2018, the [prosecution] had 'witness problems' and the matter was trailed to the next week. [¶] On September 13, 2018, defendant's trial began." (*Sims*, *supra*, C088029.)

Saria testified at the hearing on defendant's motion to dismiss that he continued to delay defendant's matter until June 2017 so defendant could have time to engage in treatment and demonstrate improvement. At a June 29, 2017 hearing, Saria requested a trial date of December 5, 2017. Defendant acknowledged the December 2017 trial date in a conversation with Costa. Saria later reset trial for January 2018 because he had surgery. When he came back from surgery, he set defendant's trial for May 22, 2018, which he testified was the soonest date he could reasonably be ready for trial and that accommodated his and the expert's trial schedule.

In early May 2018, Saria confirmed trial for later in the month and confirmed that he had received all records from the prosecution. Because Saria was engaged in trial from May 14, 2018, until May 22, 2018, Saria was granted a continuance to August 7, 2018. Trial was later moved to September 2018 because Saria was engaged in trial again.

On the day set for defendant's September 2018 trial, defendant was still located at Coalinga State Hospital, causing trial to trail for one week. On September 13, 2018, defendant's case was assigned out for trial. According to Saria, while in trial, defendant never raised any *Marsden* or ineffective assistance of counsel issues. According to defendant, he told Saria and the trial judge that he did not want Saria to represent him. Defendant also testified that he had schizophrenia, which made it difficult for him to remember things when he was in an altered mood or angry and caused him to hallucinate.

11

## VII

### *Prior Opinion And Proceedings On Remand*

Defendant appealed the judgment finding him a sexually violent predator, arguing the trial court erred by failing to address his *Marsden* and dismissal motions. (*Sims*, *supra*, C088029.) We agreed and conditionally reversed the judgment for the court to consider defendant's *Marsden* motion and motion to dismiss, in addition to any other motion counsel may make. (*Ibid*.)

On remand, the trial court granted defendant's *Marsden* motion finding the relationship between defendant and Saria had deteriorated such that Saria could not continue representing defendant. The trial court explicitly stated it did not consider whether Saria acted ineffectively in his representation of defendant.

Stan Kubochi was then appointed to represent defendant. As one of his first acts as defendant's counsel, Kubochi, at defendant's urging, filed a motion to release defendant on his own recognizance and a motion to withdraw any further *Marsden* motions. The trial court did not see a basis to grant defendant release on his own recognizance considering his case under the Act was conditionally reversed. The trial court denied defendant's motion to withdraw further *Marsden* motions as moot. During the hearing on those motions, defendant expressed confusion about our prior opinion and indicated he believed he was entitled to immediate release.

During the hearing on defendant's motion to dismiss, Kubochi called defendant to testify for the purpose of making a prima facie case of a speedy trial violation. Defendant expressed confusion about our prior opinion and the legal process at this hearing as well. After the trial court found defendant demonstrated he had asked for a speedy trial and waited several years to get one, the prosecution called Saria and Costa to testify. During argument on the motion, Kubochi acknowledged defendant had the burden as the moving party to demonstrate a speedy trial violation. Kubochi argued that Saria neglected defendant's case by asking for several continuances because he was unprepared and in

12

trial on other clients' matters. Kubochi acknowledged that Saria's requested continuances were attributed to defendant, but argued defendant was never given the opportunity to voice his complaints to the trial court or demand a speedy trial because he was housed 200 miles from the superior court and was never transported to a court proceeding.

Kubochi conceded that defendant had a parole violation and significant health issues, as well as committed serious misconduct at Coalinga State Hospital from 2009 through December 2012, making it a reasonably strategic decision not to proceed to trial. But in early 2013 and 2014 defendant made numerous requests for trial to Saria and to the court, demonstrating he did his best to get his case to trial in a speedy fashion. Ultimately, Kubochi argued Saria neglected defendant's case and the court and prosecution failed defendant by not requiring Saria to justify his repeated delays.

The trial court issued a written order before our Supreme Court filed its opinion in *Camacho v. Superior Court* (2023) 15 Cal.5th 354, 379, 382 (*Camacho*), which clarified the standard for motions to dismiss proceedings under the Act for speedy trial delays. Our Supreme Court held the speedy trial factors announced in *Barker v. Wingo* (1972) 407 U.S. 514 (*Barker*) were the correct factors to utilize. (*Camacho*, at pp. 379, 382.) Under *Barker*, the trial court found that, of the time between defendant's first request for a speedy trial in February 2009 and his trial in September 2018, four years four months of the delay was attributable to continuances defendant did not request. It found no evidence of systemic dysfunction in the administration of cases sent to the conflict criminal defender's office (conflict panel), of which Saria and Kubochi were both members. On balance, the trial court found any delay attributable to the state did not justify a conclusion defendant's right to a speedy trial was violated.

Defendant appeals.

13

# DISCUSSION

## I

### *Defendant Has Not Demonstrated He Was Entitled*
### *To An Inquiry Of Kubochi's Alleged Conflicts Of Interest*

Defendant contends Kubochi had a conflict of interest because he was appointed and paid by the conflict panel that paid Saria for his representation of defendant and Kubochi knew and worked with Saria. Defendant alleges the trial court had a duty to inquire of these conflicts. We disagree.

## A

### *Additional Background*

The conflict panel maintains a list of qualified attorneys and investigators who act as independent contractors representing criminal defendants and defendants in proceedings under the Act, as well as under other civil commitment schemes. When Saria began working for the conflict panel after a 12-year career as a criminal prosecutor, he was given a large volume of cases involving mental health considerations and continued to work on those types of cases for the next 23 years. Throughout Saria's years working for the conflict panel, limited and sporadic trainings about proceedings under the Act were available. He took some trainings presented by the State Public Defender's Office and some trainings presented by attorneys on the conflict panel. Saria testified it was his responsibility to provide those trainings and, while it should have been done, it was not.

For a short time, Saria would also have periodic lunch meetings with a group of conflict panel attorneys who litigated cases under the Act, and they would talk about best trial practices and legal developments. Saria would also engage in frequent case discussions with four or five attorneys from the conflict panel. At the time of the hearing on defendant's motion to dismiss, Saria was the deputy director of the conflict panel and was employed by Sacramento County.

14

It was Saria's practice to rely on the services of an investigator to communicate with clients housed in state hospitals. Other conflict panel attorneys representing clients in proceedings under the Act used investigators as well. Indeed, several of the attorneys on the conflict panel, in addition to Saria, used Costa as their investigator. It was Costa's practice to go to a specific state hospital every three weeks or so and visit clients over the course of a week. The conflict panel had no control or oversight of communications between Saria and Costa.

B

*Defendant Has Not Demonstrated Conflicts*

In *People v. Doolin* (2009) 45 Cal.4th 390, 421, our Supreme Court "harmonize[d] California conflict of interest jurisprudence with that of the United States Supreme Court and adopt[ed] the standard set out in *Mickens*[ *v. Taylor* (2002) 535 U.S. 162]." "Both the United States Constitution and the California Constitution guarantee criminal defendants the right to the assistance of counsel unburdened by any conflicts of interest.[2] [Citation.] Essentially, a claim of conflict of interest constitutes a form of ineffective assistance of counsel." (*People v. Perez* (2018) 4 Cal.5th 421, 435.) Our Supreme Court has "repeatedly recognized that such conflicts 'embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his [or her] [or their] responsibilities to another client or a third person or by his [or her] [or their] own interests.' " (*People v. Clark* (1993) 5 Cal.4th 950, 994, disapproved on another ground in *Doolin*, at p. 421 & fn. 22.)

In *Mickens*, the Supreme Court summarized its precedent pertaining to when the trial court has a duty to inquire of potential conflicts of interest, such that the failure to

---

**2** While defendant is not a criminal defendant, the People agree the proper standard of assessing a conflict of interest in defendant's case is the standard adopted from the United States Supreme Court in *Doolin*.

15

inquire requires remand for a hearing about the effects of the potential conflict. (*Mickens v. Taylor*, *supra*, 535 U.S. at pp. 167-172.)  It pointed to *Cuyler v. Sullivan* (1980) 446 U.S. 335, 347, which addressed "a trial court's duty to inquire into the propriety of a multiple representation, construing [past precedent] to require inquiry only when 'the trial court knows or reasonably should know that a particular conflict exists,' [citation]—which is not to be confused with when the trial court is aware of a vague, unspecified possibility of conflict, such as that which 'inheres in almost every instance of multiple representation,' [citation].  In *Sullivan*, no 'special circumstances' triggered the trial court's duty to inquire" where "the respondent was one of three defendants accused of murder who were tried separately, represented by the same counsel.  Neither counsel nor anyone else objected to the multiple representation, and counsel's opening argument at Sullivan's trial suggested that the interests of the defendants were aligned." (*Mickens*, at pp. 168-169, fn. omitted.)

The *Mickens* court also summarized *Wood v. Georgia* (1981) 450 U.S. 261, where the Supreme Court found a duty to inquire.  (*Mickens v. Taylor*, *supra*, 535 U.S. at pp. 169-172.)  There, the trial court imposed disproportionately large fines based on an apparent assumption the defendants' employer would pay, the court knew defendants' "counsel had been provided by that employer and was [advancing] a constitutional attack rather than making the arguments for leniency," and the prosecution "raised the conflict problem explicitly and requested that the court [inquire] into it."  (*Wood*, at pp. 272-273.)

Here, neither counsel questioned the propriety of Kubochi's representation or raised a potential conflict of interest with the trial court.  While defendant points to the fact that Kubochi was a member of the conflict panel, like Saria, this is not enough standing alone to require the court to inquire of possible conflicts.  The conflicting relationship must be more than that which is inherent in almost every instance of a defendant being represented by different members of the conflict panel at different times.  (Cf. *Cuyler v. Sullivan*, *supra*, 446 U.S. at p. 348 [the possibility of conflict must be more

16

than an unspecified possibility that is inherent in every instance of multiple representation].)

To overcome this hurdle, defendant argues Saria's testimony demonstrated he and Kubochi discussed cases and worked with other conflict panel attorneys to remain current on the state of the law and to cover court appearances when necessary. This is nothing more than what is inherent in the relationship of conflict panel members—to jointly educate themselves on the law and make appearances for one another when necessary. There is nothing specific in these allegations demonstrating Kubochi's loyalties were adverse to defendant and on the side of Saria or the conflict panel generally.

Defendant also points to the fact that Kubochi stood in for Saria in defendant's case on one occasion to request a continuance. The problem with defendant's reliance on this fact is that the trial court addressed it, finding it was purely an administrative appearance without involving any substantive representation. Indeed, defendant appears to agree in his opening brief that Kubochi knew little, if anything, about defendant's case or the reasons for Saria's requested continuance on the day he appeared for Saria. Thus, this too cannot show a specific conflict.

Finally, defendant argues Kubochi failed to investigate or make any argument related to the dysfunction of the conflict panel. But, as will be discussed in more detail *post*, the record does not demonstrate Kubochi failed to investigate or make available arguments related to the dysfunction of the conflict panel. Indeed, Saria and Costa were questioned about the nature and practices of the conflict panel, including the role of the attorneys and investigators. Kubochi and the prosecution questioned Saria about his caseload, his trial schedule, and whether he felt overwhelmed with cases. Kubochi further appeared to have access to Saria's billing records and checked Saria's testimony regarding defendant's case against Costa's recollections and contemporaneous notes. In sum, while the record demonstrates Kubochi did not make a strong argument of systemic dysfunction of the conflict panel, the record also demonstrates a strong argument was not

17

available based on the testimony of the witnesses regarding these topics. Thus, this also does not provide notice to the trial court of a specific conflict of interest that needed to be investigated.

Accordingly, defendant has not demonstrated the trial court knew or reasonably should have known that a specific conflict existed requiring more inquiry. Consequently, remand is not warranted for a hearing on Kubochi's alleged conflicts.

II

*Kubochi Was Not Ineffective*

Defendant raises a variety of arguments that Kubochi was ineffective in his representation during the hearing on his motion to dismiss and in regard to other matters on remand. We disagree.

Under California statute and the due process clause of the federal Constitution, a defendant under the Act has the right to effective assistance of counsel. (*In re Kerins* (2023) 89 Cal.App.5th 1084, 1110.) Ineffective assistance of counsel claims require a defendant to prove counsel's performance was deficient and that he or she or they was or were prejudiced by that deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.) The reviewing court can begin with either element and does not need to address both if one is not met. (*Id*. at p. 697.) "To demonstrate deficient performance, defendant bears the burden of showing that counsel's performance ' " ' "fell below an objective standard of reasonableness . . . under prevailing professional norms." ' " ' " (*People v. Mickel* (2016) 2 Cal.5th 181, 198.) "We presume 'counsel's conduct falls within the wide range of reasonable professional assistance' [citations], and accord great deference to counsel's tactical decisions." (*People v. Lewis* (2001) 25 Cal.4th 610, 674.) For prejudice, defendant must affirmatively "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, at p. 694.) Further, defendant must establish prejudice as " ' " 'demonstrable reality,' not simply speculation as to the effect

18

of the errors or omissions of counsel." ' " (*People v. Montoya* (2007) 149 Cal.App.4th 1139, 1151.)

A

*Defendant Has Not Shown Kubochi Was*

*Ineffective In His Investigation Of Defendant's Case*

Relying on *Wiggins v. Smith* (2003) 539 U.S. 510, defendant contends Kubochi's lack of investigation fell below professional standards. In *Wiggins*, the Supreme Court concluded the trial counsels' failure to investigate the defendant's "powerful" evidence of family, personal, and medical history in context of mitigating a possible death penalty sentence fell below reasonable professional standards. (*Id*. at pp. 524-526, 534, 536.) The unreasonableness of the trial counsels' professional judgment was supported by the record showing counsel uncovered social service records detailing mitigating childhood abuse suffered by the defendant but did not investigate or present the defense. (*Id*. at pp. 518-519, 524, 534.) Unlike the facts of *Wiggins*, defendant has pointed only to speculation and conjecture to support the contention that further investigation would have led to additional evidence relevant to defendant's motion to dismiss, and thus, he has not demonstrated Kubochi failed to pursue a viable avenue of investigation. (See also *People v. Fairbank* (1997) 16 Cal.4th 1223, 1241 ["A defendant must prove prejudice that is a ' "demonstrable reality," not simply speculation' "].)

Defendant argues Kubochi needed to conduct depositions of conflict panel officials and subpoena documents, such as Saria's billing records. Defendant contends that, if Saria would have investigated the conflict panel more, he would have discovered Saria's prolonged delays were due to inadequate supervision, training, and resources. But Kubochi asked Saria and Costa questions regarding the conflict panel's structure and responsibilities. Costa testified the conflict panel was made of attorneys and investigators independently contracted by the county to represent clients and they were not employees of the conflict panel. Saria testified he was responsible for his own

19

training and attended several trainings, although he should have attended more, and took responsibility for that failure. He testified he, and other local attorneys working in the field, primarily learned from each other and conferenced about cases and evolving issues. Further, the conflict panel paid investigators to assist attorneys and every attorney had the independence to select an investigator from the conflict panel's approved list. Being a conflict panel attorney himself, Kubochi could have reasonably agreed with Saria's and Costa's assessments and believed there was no need to call conflict panel officials to further confirm their testimony. Defendant's contention conflict panel officials would have contradicted Saria's and Costa's testimony and provided a basis to conclude the conflict panel was dysfunctional is speculative and thus insufficient to demonstrate prejudice or a tactical failure.

Defendant argues Kubochi should have investigated Saria's ignorance of his letters and petitions to the court. Kubochi, however, did question Saria about his failure to ask defendant about the orders denying his petitions for writ of habeas corpus and about his claimed ignorance as to other orders. Costa was also questioned about these matters, as well as his obligations to communicate with Saria regarding *Marsden* and speedy trial requests. Defendant does not explain how investigating the trial court's practice of forwarding orders without context or investigating Saria's excuses would have changed or added to the factual record. The fact defendant's petitions requesting a new attorney and speedy trial were left unanswered by the court and Saria is clear and speaks for itself when determining the fault of the court in the delay of defendant's trial.

Defendant argues Kubochi should have exposed Saria's competing obligations to other cases, yet Kubochi did question Saria about his caseload and its impact on defendant's case. For example, Kubochi asked Saria whether he tried to intentionally "double set" defendant's case when Saria requested a March 2015 continuance due to a conflicting homicide trial or when another attorney appeared for Saria on the May 22, 2018 trial date due to Saria's conflicting trial. Kubochi further confronted Saria about

20

trial date discrepancies.  He challenged Saria about his request to reset trial dates on May 26, 2015, because his expert needed more time when in fact, a year and four months earlier in January 2014, Saria told the court the same expert needed a month to be ready.

Kubochi and the prosecution also extensively questioned Saria about his requested continuances and why he did not proceed to trial after defendant's requests in 2009, 2011, 2013, 2014, and 2018.  Kubochi questioned Saria about why he was unprepared for trial, such as when he asked Saria about his unpreparedness for the January 6, 2015 trial date, or when he pressed Saria to explain the two-year trial delay between 2015 and 2017.  In all, Kubochi asked Saria and Costa questions designed to elicit the information that would have been elicited from a review of Saria's business records or depositions of conflict panel officials or independent contractors.  Moreover, Saria and Costa referenced notes and billing records throughout their testimony implying the availability of those documents to counsel.

Defendant points to *People v. DeCasas* (2020) 54 Cal.App.5th 785 to illustrate a reasonable investigation of systemic dysfunction, as compared to Kubochi's investigation, which he characterizes as being merely a review of his case file.  But the facts of *DeCasas* do not point to an investigation beyond what occurred here.  The evidence introduced in *DeCasas* that defendant highlights, such as the testimony and documentary evidence demonstrating the staffing reduction for attorneys representing defendants under the Act and caseload problems, were brought to light by the defendant's attorneys and elicited during their testimony.  (*DeCasas*, at pp. 790-791, 795-797, 810.) Here, Kubochi likewise examined members of the defense team.  While Saria's testimony indicates he was often in trial, he also testified his caseload did not impede his ability to take defendant's case to trial.  Saria also testified that a group of four to five attorneys in Sacramento represented defendants under the Act, which was markedly different than when he first started 23 years before when he along with one other attorney represented the same group of clients.  There is nothing from this testimony indicating that if Kubochi

21

had questioned conflict panel officials, in addition to the defense team, that he would have learned information relevant to a claim of systemic dysfunction. As a result, defendant's reliance on *DeCasas* is misplaced.

Defendant also faults Kubochi for not investigating a former client of Saria's whose case was dismissed for a speedy trial violation. (*In re Jones* (June 5, 2019, C087866) [nonpub. opn.].) Defendant contends an investigation into that case would have revealed systemic dysfunction on the part of the conflict panel. We disagree. In the case of Saria's former client, the client was represented by four attorneys, including Saria, and the prosecution and the trial court were also found to be causes of the long delays because they permitted or acquiesced to continuances without a proffer of good cause. (*Ibid.*) There was no dysfunction attributed to the conflict panel as a system, but instead to the court and the client's various attorneys who were willfully blind to his objections to repeated continuances or misrepresented the reasons for the continuances to the court and the client.[3] (*Ibid.*) As a result, it is purely speculative that further investigation into Saria's former client's case would produce evidence of a systemic breakdown in the conflict panel system.

Defendant also contends Kubochi should have interviewed an expert in cases under the Act to determine the professional norm. Kubochi questioned Saria about this topic and elicited the professional norm of the local legal community. Costa was also questioned about this topic and testified to his experience with Saria and the other attorneys on the conflict panel that he worked with. Again, there is no indication that interviewing a person other than Saria, who had over two decades of experience in the field, or Costa would have yielded additional information.

---

[3] The attorney who misrepresented the reasons for the requested continuances was not Saria. (*In re Jones*, *supra*, C087866.)

22

Finally, defendant contends Kubochi should have investigated the State Department of State Hospitals and its sexually violent predator treatment program to determine whether it contributed to the delays in defendant's trial or ability to demonstrate rehabilitation. Again, defendant's claims are speculative. Defendant testified to his progress in the state hospital, including that he attended treatment sporadically and had not advanced through all the treatment phases. Further, Saria and Costa testified, and the prosecutor and Kubochi explained, the varying programs the State Department of State Hospitals employed throughout defendant's treatment. Unlike the facts of *Wiggins v. Smith*, *supra*, 539 U.S. at page 524, where the defendant's social service records provided more than speculation that evidence of mitigating circumstances existed, it is unclear and speculative that further investigation into the State Department of State Hospitals would have led to information beneficial to defendant's case.

B

*Defendant Has Not Shown Kubochi Was Ineffective In His Arguments To The Court*

Defendant contends Kubochi was ineffective by abandoning defendant's strongest arguments and strategically disadvantaging him during the presentation of his case. We disagree.

Kubochi's argument to the trial court was that Saria neglected defendant by prioritizing his other cases to the detriment of defendant's case and also cited instances where Saria ignored defendant's demands for trial and lacked good cause for some of the trial delays. Defendant contends Kubochi should have also argued that Saria's delays cost defendant the opportunity to present a favorable evaluator, i.e., the one evaluator out of four who concluded before the probable cause hearing that defendant did not meet the criteria of a sexually violent predator. But Kubochi had to demonstrate prejudice in the context of the delay. (*Camacho*, *supra*, 15 Cal.5th at pp. 392-393.) In the context of the favorable evaluator, there were three other experts who disagreed with the favorable diagnosis and defendant was suffering from apparent signs of active psychosis. Saria

23

consulted with his own expert and determined defendant would need to be rehabilitated to participate in his defense. Once defendant showed signs of improvement in September 2009, defendant wanted to engage in treatment while working on a plan for release. The delay was short in duration, requested by defense counsel, and for the purpose of rehabilitating defendant so he would present as having control of his mental health condition. This delay cannot be attributed to the state and alone is not a basis for granting a motion to dismiss. (See *id*. at p. 393 [the defendant was unable to show prejudice despite a favorable evaluation because he did not contemporaneously want a timely trial and there was no indication the subsequent seven-year delay undermined his ability to receive a fair trial].)[4]

Defendant also claims Kubochi was ineffective by erroneously believing his burden was to produce a "prima facie" case. The record does not confirm defendant's characterization of Kubochi's argument. The record establishes Kubochi and the trial court's understanding was that the defense was first establishing the threshold factor of the *Barker* test, the length of the pretrial delay. (*Barker*, *supra*, 407 U.S. at p. 530.) Kubochi referenced the defense's burden during the hearing and made arguments during closing aimed at carrying it. There is no basis in the record to conclude Kubochi did not know of the proper standard.

Defendant argues Kubochi should have called Saria as a defense witness and "skillfully questioned" him, but because the prosecution questioned Saria first, Kubochi allowed it to elicit Saria's testimony in "the best possible light." But as described, the record does not demonstrate that Kubochi allowed Saria to testify uncontested. Kubochi

---

[4]     For the first time in reply, defendant contends he had two favorable evaluations before the probable cause hearing. Even if true, our conclusion would not change given the concerns outlined here. Further, the expert referenced by Saria as the favorable evaluator, testified at defendant's eventual trial that his favorable evaluation suffered from several information gaps, undermining the reliability of his evaluation.

did challenge Saria about his competing caseload, his continuances, and about defendant's demands for trial. Kubochi's decision not to call Saria and instead cross-examine him was a reasonable tactical decision considering leading questions are generally only available during cross-examination and Kubochi could reasonably believe they were better to challenge the veracity of Saria's testimony. (See Evid. Code, § 767; *White v. Illinois* (1992) 502 U.S. 346, 356 [cross-examination has long been referred to as " 'the greatest legal engine ever invented for the discovery of truth' "]; see also *People v. Stanley* (2006) 39 Cal.4th 913, 954 [reiterating that " ' "courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight" ' "].) As a consequence, defendant has not shown Kubochi was ineffective in the presentation of his case.

## C

### *Defendant Has Not Shown Kubochi Was*
### *Ineffective Regarding Matters Outside His Motion To Dismiss*

Defendant contends Kubochi was ineffective for bringing a motion to withdraw defendant's *Marsden* motions and a motion for defendant's release on his own recognizance. Defendant cannot demonstrate prejudice. First, contrary to defendant's argument, the record reflects Kubochi filed these motions at defendant's request. (See *People v. Majors* (1998) 18 Cal.4th 385, 409 [" 'The invited-error doctrine operates . . . to estop a defendant from claiming ineffective assistance of counsel based on counsel's acts or omissions in conformance with the defendant's own requests' "].) Kubochi indicated he filed the motion to release defendant on his own recognizance at defendant's request. This motion was filed at the same time as the motion to withdraw further *Marsden* motions and both relied on only a declaration from defendant for support. Taken together, it is clear Kubochi filed these motions at defendant's request. Second, these motions were collateral and irrelevant to defendant's motion to dismiss. As a

consequence, defendant cannot demonstrate a different outcome would have resulted had Kubochi not filed the motions. (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694.)

Defendant further contends Kubochi was ineffective for failing to file a motion for a new trial alleging the trial court should have considered and granted a retroactive *Marsden* motion against Saria given the prolonged delays in bringing defendant's case to trial and Saria's failure to communicate with him. It is unclear, however, that such motion would have been granted, and thus, defendant cannot demonstrate prejudice. Saria and Costa testified they were in regular communication with defendant and communicated the status of his case and reasons for their requested continuances. Costa referenced his notes of meetings with defendant and Saria referenced billing records and letters he sent to defendant. Defendant sent letters and made phone calls to Saria, which Saria noted in his billing records, and requested visits with Costa, which Costa honored. Defendant never referenced an immediate trial or the desire to have different counsel in his communications with Saria or Costa. While defendant filed petitions and letters with the court directly complaining of delay and Saria, there is no evidence in the record, besides defendant's self-serving statements, that defendant communicated those criticisms to Saria or Costa. Further defendant testified he experiences memory lapses due to his schizophrenia diagnosis. He further expressed confusion during his court appearances, undermining his credibility concerning recall of past events. Accordingly, the record does not indicate Saria failed to communicate to defendant such that a retroactive *Marsden* motion would have been successful, i.e., the attorney client relationship had irrevocably broken down. (See *People v. Panah* (2005) 35 Cal.4th 395, 431 [" 'A defendant is entitled to have appointed counsel discharged upon a showing that counsel is not providing adequate representation or that counsel and [the] defendant have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result' "].)

26

The same is true for the delays. While defendant's case took a long time to progress to trial, that is not uncommon for cases brought under the Act. (*Camacho*, *supra*, 15 Cal.5th at p. 376 ["Extended delays [in cases brought under the Act]—in some cases upwards of a decade—have not been uncommon"].) The record demonstrates defendant wanted to be successful at trial and he often took Saria's advice to engage in treatment so his likelihood of success could increase. While defendant expressed a desire to go to trial, he did not make demands for immediate trial directly to Saria or Costa. When defendant requested trial, Saria scheduled trial. Defendant, however, would later change his mind—many times to increase the likelihood of success at trial by engaging in treatment. Thus, while the delays were long, the record does not point to an irrevocably broken relationship.

Defendant finally argues Kubochi should have filed a motion for a new trial based on Saria's ineffective representation for failing to call an expert at his trial. Indeed, defendant argues Saria should have found any expert who would have testified that defendant did not meet the criteria for a sexually violent predator even though an expert Saria repeatedly used had already determined defendant met the criteria. First, it is speculative that Saria could have found an expert who would have favorably testified on defendant's behalf. (See *People v. Fairbank*, *supra*, 16 Cal.4th at p. 1241.) Second, defendant does not attempt to demonstrate this purported expert would have been credible during trial given the rest of the evidence, thus changing the result. Consequently, defendant cannot demonstrate prejudice in Saria's alleged failure to contact further experts or call one "that almost always found that the defendant was not [a sexually violent predator]."

## III

### *There Was No Due Process Violation*

Defendant contends the trial court erred by denying his motion to dismiss. We review the trial court's findings of fact for substantial evidence and its conclusions of law

de novo. (*Camacho*, *supra*, 15 Cal.5th at p. 383.) " '[I]ts application of the law to the facts is reversible only if arbitrary and capricious.' " (*Ibid*.) When determining whether substantial evidence exists, we " ' " 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence [that] is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the [factual findings true] beyond a reasonable doubt.' " ' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) We do not reweigh or settle conflicts in the evidence, nor do we assess the credibility of witnesses. (*In re Caden C.* (2021) 11 Cal.5th 614, 640 (*Caden C.*).) We conclude the trial court did not abuse its discretion or make unsupported findings of fact.

A

*Relevant Authority*

Recently, in *Camacho*, our Supreme Court considered, for "the first time," "the constitutional framework for evaluating the timeliness of [sexually violent predator] trials." (*Camacho*, *supra*, 15 Cal.5th at p. 368.) Our Supreme Court held, "[I]t suffices to consider the factors laid out in *Barker* in deciding whether an alleged [sexually violent predator] has been deprived of the constitutional right to a timely trial." (*Camacho*, at p. 379.) "The *Barker* test outlines a broadly relevant set of functional, case-dependent factors to consider in analyzing questions of trial timing. To the extent the [sexually violent predator] context differs from the criminal context in which *Barker* was decided, the flexibility of the test allows courts to account for those differences." (*Camacho*, at p. 381.)

"[T]he *Barker* court declined to adopt any bright-line rules for determining when the right has been violated. The court instead identified four factors for courts to examine: the length of the pretrial delay, the reason for the delay, the defendant's assertion of his[, her, or their] right, and prejudice to the defendant caused by the delay. [Citation.] The defendant carries the 'burden of demonstrating a speedy trial violation

28

under *Barker*'s multifactor test.' [Citation.] Because none of these factors is dispositive, 'courts must still engage in a difficult and sensitive balancing process' to determine whether trial has been unconstitutionally delayed." (*Camacho*, *supra*, 15 Cal.5th at p. 380.)

B

*The Trial Court Did Not Abuse Its Discretion*

1

*The Length Of The Delay Weighs In Favor Of Finding A Speedy Trial Violation*

"We begin with the first *Barker* factor, the length of the pretrial delay. This factor operates as a threshold hurdle; '[u]ntil there is some delay [that] is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.' [Citation.] 'If the accused makes this showing, the court must then consider . . . the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim.' " (*Camacho*, *supra*, 15 Cal.5th at p. 383.)

Here, defendant awaited trial on a petition for recommitment that was filed in January 2009 and ultimately taken to trial in September 2018. (*Sims*, *supra*, C088029.) Defendant's first demand for a speedy trial was in February 2009. (*Ibid*.) "Although this delay is not entirely out of line with delays seen in other [sexually violent predator] cases, it is an exceedingly lengthy delay all the same." (*Camacho*, *supra*, 15 Cal.5th at p. 383; see *id*. at p. 376, fn. 2 [reciting cases with anywhere from three- to 22-year delays, with the average case having a delay of over 10 years].) The People concede, and we agree, this prolonged delay weighs in defendant's favor of demonstrating a speedy trial violation.

Defendant points to the trial court's analysis of this factor to demonstrate it abused its discretion. Defendant faults the trial court for breaking his case into various time periods so it could find the length of the delay was minimal. The problem with defendant's argument is that it ignores the trial court's finding after defendant's

29

testimony that the delay extended from the probable cause hearing to defendant's ultimate trial. He also ignores the trial court's order that described the delay as occurring over the course of nine years. Because of this threshold finding, the trial court found it necessary to consider the other factors of the *Barker* test. (See *Camacho*, *supra*, 15 Cal.5th at p. 383.) The court's finding defendant was responsible for some of the delay, while stated during the analysis of the first *Barker* factor, was clearly a reference to its conclusion of the second *Barker* factor, which pertains to the reasons for the delay. Accordingly, defendant has not shown the trial court abused its discretion when determining whether the length of the delay favored a finding his due process rights had been violated.

2

*The Reason For Delay Weighs Neutrally*

"We next turn to the second *Barker* factor, the reasons for the delay. This is the 'flag all litigants seek to capture' [citation] because the permissibility of pretrial delay depends to a great extent on who bears responsibility for it and why. [¶] In analyzing the second factor, courts examine 'whether the government or the criminal defendant is more to blame for th[e] delay.' [Citations.] Courts also examine why the delay occurred, for 'different weights should be assigned to different reasons.' [Citation.] If the government deliberately delays trial to hamper the defense, for instance, that effort at manipulation 'should be weighted heavily against the government.' [Citation.] 'A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.' " (*Camacho*, *supra*, 15 Cal.5th at pp. 383-384.) " 'Between diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial occupies the middle ground. While not compelling relief in every case where bad-faith delay would make relief

30

virtually automatic, neither is negligence automatically tolerable.' " (*Id*. at p. 388.) "Because trial courts ultimately control when trial will be held, they bear particular responsibility for preserving an alleged [sexually violent predator]'s constitutional right to a timely trial." (*Id*. at p. 389.)

"By contrast, 'if delay is attributable to the defendant, then his[, her, or their] waiver [of his, her, or their right to a speedy trial] may be given effect under standard waiver doctrine.' " (*Camacho*, *supra*, 15 Cal.5th at pp. 383-384.) Here, the trial court found the defense requested all but one of the continuances and defendant does not dispute that finding. "In general, delays sought by the defendant's counsel weigh against the defendant's claim of a speedy trial violation." (*Id*. at p. 385; accord, *Vermont v. Brillon* (2009) 556 U.S. 81, 92-93.) Both the United States Supreme Court and our Supreme Court have "noted that the analysis might be different if . . . the delay was shown to result from 'a systemic "breakdown in the public defender system." ' " (*Camacho*, at p. 385.) Our Supreme Court further permitted consideration of whether defense counsel acted against defendant's express wishes or defendant's time waiver was involuntary. (*Id*. at pp. 385-386.)

Defendant raises several arguments the trial court erred when conducting its analysis of this factor. First, he argues the trial court ignored whether there was a systemic breakdown in the conflict panel when analyzing the *Barker* factors. While the court may not have addressed this issue in its *Barker* analysis, it considered the issue as part of its order and found there was no systemic breakdown. We are bound by this factual determination unless unsupported by substantial evidence. (*Camacho*, *supra*, 15 Cal.5th at p. 383.) Defendant does not claim this finding lacks sufficient support and concedes throughout his brief there was no evidence of systemic dysfunction of the conflict panel. Instead, defendant points to considerations he claims make the court's finding flawed, including Saria's apparently heavy caseload, Kubochi's purported ineffective investigation, and Saria's unwillingness to consult more than one expert as a

sign of insufficient funds and an underdeveloped expert pool. Defendant's argument amounts to a reweighing of the evidence we are precluded from undertaking. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) Thus, defendant cannot demonstrate error in this regard.

Second, defendant argues the trial court ignored delays caused by the court or prosecution. This is not supported by the court's order. Just like the court's analysis of systemic dysfunction, the court analyzed the prosecution's failures. It found the prosecution requested a single continuance of one week and the remainder of the continuances were at Saria's request without objection from the prosecution. Following this finding, the trial court analyzed the entire timeline of defendant's case, broken into various periods, to assess whether Saria delayed trial with defendant's express consent, ultimately finding under the *Barker* test that four years four months of the delay was without defendant's express consent. The court also addressed its own failings, finding it shouldered blame for delay and failure to respond to defendant's *Marsden* requests. In the end, a reasonable reading of the court's order is that it found the delays caused by the prosecution and itself were for neutral reasons and were not justified, yet not egregious. Thus, we disagree with defendant's reliance on *In re Butler* (2020) 55 Cal.App.5th 614, 660 to argue the trial court should have assigned blame for the delay to the court. The trial court did, in fact, do so here.

To the extent defendant assigns error to the trial court because it failed to conduct a specified form of analysis, that contention lacks merit and puts form over substance. While *Camacho*, *supra*, 15 Cal.5th at pages 384-391 engaged in a particular organization of analysis, there was nothing in our Supreme Court's opinion requiring the trial court do the same. We note the trial court did not have the benefit of our Supreme Court's *Camacho* opinion and clarifying analysis of an issue trial and appellate courts have struggled with for some time. (*Id*. at p. 377, fn. 2.) While the court's order does not follow *Camacho*'s organization and included a *Mathews v. Eldridge* (1976) 424 U.S. 319 due process analysis our Supreme Court deemed unnecessary, the trial court made all

factual findings required by *Camacho* and reasoned its conclusions based on those findings at the end of the order.  As a result, defendant has not demonstrated the court applied the wrong standard or failed to make required considerations.

Third, defendant argues the trial court conflated the *Barker* factors analyzing his assertion of the right to a speedy trial and resulting prejudice with the factor analyzing the reason for the delay.  We disagree this was error.  Whether delay constitutes government delay necessarily depends on whether defendant wanted the delay.  If defendant agreed to a delay, then there was no government-caused delay for purposes of assessing the reason for a delay.  Our Supreme Court said as much in *Camacho* when it declined to attribute a defense counsel's requested continuances to government delay absent a showing the defendant objected or otherwise disapproved of the continuances.  (*Camacho*, *supra*, 15 Cal.5th at pp. 385-387.)  While defendant characterizes the court's finding that defendant would not present well at trial while he was suffering from active symptoms of his mental health condition as a finding he was not prejudiced by delay, we read the court's finding as a determination about whether defendant expressly disagreed with Saria's decision to continue trial given the manifestations of his mental illness at the time the decision was made.  This finding is permitted under *Camacho*, which considered whether counsel acted counter to a defendant's express wishes.  (*Id*. at p. 386.)

Defendant next analyzes each of the trial court's determinations challenging them as inaccurate or unreasonable.  Defendant argues the trial court's finding that the delay between February 2009 and August 2012 was attributable to him was not supported by substantial evidence.  Defendant's argument is a reinterpretation of the evidence and discounts the interpretation found by the trial court.  (See *Caden C.*, *supra*, 11 Cal.5th at p. 640.)  Indeed, the court acknowledged defendant requested a speedy trial at a February 2009 hearing.  The record reflects, however, that defendant expressed confusion at this hearing, and when Costa and Saria followed up with defendant about his concerns, he was suffering from active symptoms of his mental health condition and was

33

hallucinating. In Saria's opinion, defendant was incompetent to stand trial and unable to assist in his defense. When defendant's mental health improved, he expressed a desire to enter treatment and create a plan for release. This evidence leads to the reasonable inference Saria did not act counter to an informed and express desire to go to immediate trial. Thus, substantial evidence supports the court's finding the resulting delay for defendant to regain competency could not be placed on the government but resided with defendant.

Defendant's journey to competency was complicated by his parole violation and, when he returned from prison custody in June 2010, he did not object to continuances requested by Saria and even agreed to engage in treatment prior to his March 2011 communication with Costa so he could go to trial for the purpose of going home. Continuances for defendant to participate in treatment continued beyond August 2012 without objection from defendant to Saria or Costa, even though defendant filed a petition for writ of habeas corpus in August 2012 requesting a speedy trial. Accordingly, the evidence supports the trial court's finding Saria's requested continuances between February 2009 and January 2013 were for defendant's benefit and with his consent.

Defendant appears to agree with the trial court's determination the delay between mid-January 2013 and the end of May 2013 and mid-June 2013 and January 2014 were not consented to by defendant. Instead, defendant argues the trial court should have extended this finding to include the time between the end of May 2013 and mid-June 2013. We disagree. The trial court noted that Saria received defendant's updated treatment records and needed time to prepare. Reasonable preparation for trial is for defendant's benefit and the resulting delay is attributable to defendant. (See *Camacho*, *supra*, 15 Cal.5th at p. 386.) Defendant disagrees, arguing Saria should have always been preparing for his trial and the release of updated records is common and should not necessitate delay. But the trial court's finding that a one-month delay was reasonable for review of updated records is neither capricious nor unsupported by the record as Saria

34

testified it took several months to review the voluminous records produced by Coalinga State Hospital and to consult an expert.

Defendant next challenges the court's finding he asked for a year break in November 2013 in a bid to attribute the delay between January 2014 and February 2014 to Saria instead of himself. He argues he did not ask for a break from Saria preparing for trial, but that a trial should occur in November 2014. Thus, Saria's failure to continue preparing for trial during that time should not be counted against him. This is not the test. (*Camacho*, *supra*, 15 Cal.5th at pp. 385-386 [we look to whether counsel acted contrary to defendant's express wishes].) Defendant said he did not want to go to trial for one year. It is not unreasonable or unsupported by the evidence to conclude Saria could stop preparing for two months directly after defendant said he was not seeking trial for a year.

Defendant does not dispute the trial court's finding the delay between February 2014 and January 2016 was without his express consent. Defendant does not appear to take issue with the trial court's further factual findings regarding the delay after January 2016 as with his consent, except to argue that finding should have extended only to March 2016, instead of August 2016 as found by the trial court. The trial court based its finding on the fact that Saria should have become aware of defendant's demand for a speedy trial as alleged in a March 2016 petition for writ of habeas corpus in August 2016 when he was constructively served with it. Defendant argues Saria should have been aware at the time defendant filed the petition making his demand. We disagree. Defendant did not mail Saria the petition or otherwise communicate his desire to go to trial, even though he had mailed letters and called Saria in the past. Instead, defendant sent the petition directly to the court, which addressed writ petitions in a different department than defendant's case. The order on the petition was forwarded to Saria and served on replacement counsel. The court counted the subsequent time from service until December 2016 when defendant told Saria he was no longer requesting trial as without

35

defendant's consent, discounting Saria's excuses for not having actual knowledge of defendant's speedy trial demand. This was neither unreasonable nor unsupported by the record.

Defendant does not appear to challenge the court's findings Saria delayed without consent from August 2016 through November 2016, defendant consented to the delay between December 2016 and June 2017, and Saria delayed without express consent from June 2017 through trial in September 2018.

Ultimately, the trial court appeared to assign neutral weight to this factor such that it neither supported nor undermined a due process claim. It assigned some weight to the prosecution and the court for its neutral contribution to the delay in defendant's case and assigned only moderate weight to defendant who did not expressly consent to half of the delay. As described, these findings are neither unreasonable nor unsupported by the record.

3

*Defendant's Speedy Trial Assertion Weighs*

*Against Finding A Speedy Trial Violation*

"Analysis of the third *Barker* factor, the [defendant]'s assertion of his[, her, or their] right to a timely trial, does not hinge on ' "the number of times the accused acquiesced or objected; rather, the focus is on the surrounding circumstances, such as the timeliness, persistence, and sincerity of the objections, the reasons for the acquiescence, whether the accused was represented by counsel, the accused's pretrial conduct (as that conduct bears on the speedy trial right), and so forth. [Citation.] The totality of the accused's responses to the delay is indicative of whether he or she [or they] actually wanted a speedy trial." ' [Citation.] Viewing the complete picture matters because '[t]he more serious the deprivation [of the right to a speedy trial], the more likely a defendant is to complain.' [Citation.]

36

"It bears some emphasis that assertion of the right is only one factor in the analysis, and not a dispositive one; in *Barker*, the court explicitly rejected the argument that a defendant must expressly demand a speedy trial or else be deemed to have waived the right. [Citation.] Instead, the court instructed that 'the defendant's assertion of or failure to assert his[, her, or their] right to a speedy trial' is just one factor to balance against the others and must be evaluated in a holistic manner. [Citation.] This flexibility allows courts 'to attach a different weight to a situation in which the defendant knowingly fails to object from a situation in which his[, her, or their] attorney acquiesces in long delay without adequately informing his[, her, or their] client, or from a situation in which no counsel is appointed.' [Citation.] The high court emphasized, however, that 'failure to assert the right will make it difficult for a defendant to prove that he[, she, or they] was [or were] denied a speedy trial.' " (*Camacho*, *supra*, 15 Cal.5th at pp. 390-391.)

Here, the court found defendant unequivocally requested a speedy trial three times—February 2009 in court, August 2012 in a petition for writ of habeas corpus, and March 2016 in a petition for writ of habeas corpus. The trial court further found defendant's contemporaneous and subsequent conduct demonstrated he did not genuinely desire a speedy trial. Defendant spends much time recounting the facts in an attempt to show the trial court's findings lacked substantial evidence or were unreasonable. We disagree.

Our review of the record shows defendant asserted his right to a speedy trial in February 2009 when he was suffering from active symptoms of psychosis and hallucinations. He also expressed confusion at that time and appeared to lack awareness of his legal proceedings. Indeed, Saria believed defendant was unable to assist in his own defense. After defendant was transferred to Coalinga State Hospital and began to regain competency, he expressed a desire to engage in treatment and come up with a release plan. Given defendant's mental health condition, which included hallucinations, and his subsequent conduct preferring to engage in treatment and work towards release, sufficient

evidence supports the trial court's finding defendant's request for a speedy trial in February 2009 was not genuine.

While defendant filed a writ petition and letters with the court in 2011 complaining of Saria's performance, he did not request a speedy trial in these communications. It was not until August 2012 that defendant asked for a speedy trial in a letter sent directly to the court. Defendant did not make this demand to Saria or Costa in person. Also at this time, defendant was engaging in treatment after Saria's March 2011 advice about how to win at trial. Defendant was later placed on an involuntary medication order, stopped engaging in treatment, and then reengaged in treatment in January 2013 when he requested a summer trial. Given defendant's failure to request a speedy trial directly from Saria or Costa and his contemporaneous behavior, substantial evidence supports the trial court's finding defendant's August 2012 request for a speedy trial was not genuine.

Defendant's next request for trial was in January 2013, when he told Costa he was in treatment and prepared to go to trial. The record supports the trial court's implied finding this was not a request for a *speedy* trial, contrary to defendant's contention. Prior to the request, defendant had stopped going to treatment and did not reengage in treatment until January 2013. Saria had previously, and at this time, advised defendant he needed to engage in consistent treatment to increase his likelihood of success at trial. When defendant requested trial in January 2013, Saria set a summer trial date to demonstrate defendant was committed to treatment. Saria continued defendant's trial because he needed to review records and was in trial with another client and in November 2013, before trial occurred, defendant elected to continue with treatment for one year and delay trial. Given defendant did not request a speedy trial, delays were necessary for trial preparation, and defendant elected to take a break from trial preparation to engage in treatment, substantial evidence supports the trial court's implied finding defendant did not request a speedy trial in January 2013.

38

In March 2014, defendant requested to go to trial in the summer of that year. Saria complied by setting an August 2014 trial readiness date with a corresponding October 2014 trial. Several delays occurred beyond the October 2014 date until November 2015, when Saria received defendant's records and his expert was able to provide an evaluation. When later confronted with the unfavorable defense expert evaluation, defendant opted to continue engaging in treatment. Given defendant's prior stated goal of a successful trial and his subsequent acknowledgement he needed treatment to succeed, substantial evidence supports the trial court's implied finding defendant's request for trial in March 2014 was not for a speedy trial.

In March 2016, defendant filed a petition for writ of habeas corpus with the trial court wherein he asked for a speedy trial. While defendant claimed to have told Saria and Costa of his desire to go to trial, both Saria and Costa testified defendant did not tell them he wanted to go to trial. The trial court accepted Saria's and Costa's versions of events and we are bound by that factual determination. (See *Caden C.*, *supra*, 11 Cal.5th at p. 640.) At this time, defendant had agreed to resume treatment at the end of 2015 because of the unfavorable expert evaluation until June 2017 when his case was placed back on calendar for trial. Given this evidence, we conclude there is sufficient support for the trial court's finding defendant's March 2016 request for a speedy trial was not genuine.

Defendant disagrees, arguing his mental health condition prevented him from understanding he had to communicate his desire for a speedy trial to Saria, and that his petitions to the court should be enough to demonstrate he genuinely wanted a speedy trial. The record refutes this contention. Defendant sent numerous letters to Saria and called him on the phone. He inquired of the status of trial and communicated about a broad range of topics. The evidence supports a finding he was capable of communicating his desire for a speedy trial to either Saria or Costa. While the fact defendant made requests through petitions for writs of habeas corpus is relevant to the analysis, it is not

39

determinative given his lack of communication with counsel despite his apparent ability to do so.

Defendant also faults the trial court for not giving him the benefit of the doubt because he was not present in court. Our Supreme Court in *Camacho*, however, held that a court cannot give defendants special consideration simply because they were not present. (*Camacho*, *supra*, 15 Cal.5th at pp. 385-386.) Our Supreme Court held additional evidence, such as the fact counsel acted contrary to a defendant's express wishes, is required before finding a defendant's absence should be held against the government. (*Ibid.*) Here, defendant's wishes were not expressed to Saria, which is relevant to the veracity of the assertion of his speedy trial right. (*Id*. at p. 386.)

Finally, defendant contends the trial court put too heavy a burden on defendant to demonstrate he wanted a speedy trial by essentially forcing him to assert his right over and over despite Saria's continued delay. Defendant compares his case to *People v. Superior Court* (*Vasquez*) (2018) 27 Cal.App.5th 36, 62-63 where the appellate court concluded substantial evidence supported the trial court's finding the defendant did not support his counsel's requested continuances, but instead was forced to acquiesce so his counsel would be prepared. Comparing cases in the sufficiency of the evidence context is of limited utility as every case necessarily depends on its own facts. (*People v. Thomas* (1992) 2 Cal.4th 489, 516.) In any event, the *Vasquez* court was tasked with identifying evidence that supported the trial court's findings and conclusions that the defendant's speedy trial rights were violated. (*Vasquez*, at p. 55.) We are tasked with the same duty to identify evidence supporting the trial court's finding. (*Camacho*, *supra*, 15 Cal.5th at p. 383.) While one interpretation may be that defendant felt he had to give into Saria's continuances so that Saria would be prepared, another interpretation, indeed the interpretation the trial court made, is that defendant did not genuinely desire immediate trial and wanted to be successful. The record supports this inference. Thus, the trial

court's finding that this *Barker* factor weighs against defendant's claim of a due process violation is neither unreasonable nor unsupported by the record.

4

*Prejudice To Defendant Weighs Against A Speedy Trial Violation*

"The final *Barker* factor is the prejudice to the defendant caused by the delay in bringing the case to trial. 'Prejudice, of course, should be assessed in the light of the interests of defendants [that] the speedy trial right was designed to protect.' [Citation.] In the criminal context, the court has identified 'three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.' " (*Camacho*, *supra*, 15 Cal.5th at p. 391.) While delay presumably prejudices criminal defendants, who are judged by proof of past conduct, sexually violent predators are judged by proof of their current conduct and evaluation, mitigating the presumption of prejudice that applies in criminal cases. (*Id.* at pp. 391-392.) Similarly, "pretrial [sexually violent predator] custody does differ from pretrial criminal detention in certain pertinent respects. After the trial court holds a probable cause hearing, alleged [sexually violent predator]s are confined at a state hospital, not jail, and begin receiving mental health treatment while they await trial. [Citations.] Pretrial treatment of the underlying mental disorder that caused the state to seek commitment in the first place may ultimately facilitate the individual's release before trial." (*Id.* at p. 393.)

"Determining how heavily to weigh the prejudice resulting from pretrial custody therefore requires a sensitive inquiry into the circumstances of the case. For individuals who have never received a favorable expert evaluation, delay in holding trial will generally entail less prejudice than for individuals who have a more substantial basis for arguing they do not satisfy the criteria for [sexually violent predator] commitment. Where an individual makes such a showing, the amount of prejudice may increase as the length of the delay increases. For example, in the case of an individual who has expert

41

reports recommending release, a four-year delay in going to trial will generally be significantly more prejudicial than a one-year delay." (*Camacho*, *supra*, 15 Cal.5th at p. 393.)

Applying these general principles to defendant's case, the delay here had no appreciable impact on defendant's case. At the start of defendant's case in 2009, one expert concluded he did not meet the criteria for commitment. After the favorable evaluation was made, however, defendant exhibited manifestations of a mental health condition, including hallucinations, anxiety, and pressured speech. Given the at least two unfavorable evaluations and defendant's presentation, we cannot conclude defendant was prejudiced by the 2009 delay. While commitment to the state hospital resulted from the delay, the commitment was for the purpose of engaging in services designed to aid his mental health condition so he could participate in his defense, and thus, cannot be considered as oppressive as criminal confinement.

Shortly after being transported to the state hospital for mental health treatment, defendant violated his parole by committing a sexual battery against a state hospital staff member and was incarcerated until June 2010. Upon defendant's return to the state hospital, he continued to appear mentally ill, as well as physically impaired, and committed several rule violations, including by exhibiting acts of aggression and sexualized conduct. This conduct continued until June 2011. Given defendant's unavailability, incapacitation, and rule violations, which would have severely hampered his defense had he gone to trial, we conclude his defense was not prejudiced by the delay between his transportation to Coalinga State Hospital and June 2011.

In March 2011, defendant expressed a desire to go to trial for the purpose of going home. Needless to say, this required defendant to be successful at his commitment hearing. From March 2011 through January 2013 defendant committed several rule violations consisting of threatening behavior and sexualized conduct. While his violations decreased after January 2013, defendant was on involuntary medication orders,

which influenced his behavior, and was inconsistent with his engagement in treatment, despite requesting time for treatment to increase his chances at a successful trial.

In March 2014, defendant requested trial, and Saria set it for fall 2014 so he and an expert could prepare. By November 2015, the defense expert informed Saria he could not testify favorably for defendant. Given the prospect that he would not be successful at trial, defendant elected to reengage with treatment and his trial was taken off calendar until June 2017. We cannot conclude that defendant suffered any prejudice during the delay between March 2014 and June 2017 because his request for trial was for the purpose of succeeding and going home, not an unconditional demand for trial, and he cannot show he would have been successful at trial. Indeed, defendant reengaged in treatment in early 2016 when recommended by Saria so his chances at success would increase.

In June 2017, defendant's case was put back on track for trial, which eventually occurred in September 2018. While defendant had continued to engage in treatment and does not appear to have experienced any rule violations, he was on a forced medication order. Saria also could not find a favorable expert to testify on defendant's behalf. Given defendant's continued struggles and unfavorable evaluations, it is not likely this delay affected his case or otherwise decreased his chances at a successful trial.

The length of delay from defendant's first request for a speedy trial— approximately nine and a half years—is significant and defendant has been involuntarily committed throughout that period. But, like the defendant in *Camacho*, there is no indication the delay undermined the fairness of the proceedings. Prejudice is further minimized because defendant has not shown he genuinely wanted a timely trial. (See *Barker*, *supra*, 407 U.S. at p. 534 ["More important than the absence of serious prejudice, is the fact that [the defendant] did not want a speedy trial"].) Accordingly, substantial evidence supports the trial court's finding the prejudice factor did not weigh in favor of a due process violation.

*The Factors Balance Against A Speedy Trial Violation*

Balancing the *Barker* factors, we conclude defendant has not demonstrated the trial court abused its discretion by finding no violation of defendant's due process right to a timely trial. Only one factor—the length of the delay—strongly supports defendant's claim of a due process violation. Though some of the weight for the delay must be assigned to the trial court, the prosecution, and Saria, defendant also bears some weight by consenting to more than half of the delay throughout various points during the pendency of his proceedings. Defendant was inconsistent in his desire for a *speedy* trial and did not communicate his desires directly to his attorney; when he did, trial was set before defendant eventually changed his mind and elected to continue treatment. Finally, defendant did not suffer significant prejudice to his case as demonstrated by the consistent manifestations of defendant's mental health disorder and adverse evaluations finding he met the criteria of a sexually violent predator. Accordingly, we conclude the court did not abuse its discretion by finding defendant did not suffer a violation of his right to a timely trial.

DISPOSITION

The order denying defendant's motion to dismiss is affirmed.

/s/_____
ROBIE, Acting P. J.

We concur:

/s/_____
KRAUSE, J.

/s/_____
FEINBERG, J.